Kevin R. Crisp (Bar No. 97504)
Jeffrey A. Vinnick (Bar No. 137005)
Elizabeth P. Trent (Bar No. 272258)
HAIGHT BROWN & BONESTEEL LLP
555 South Flower Street, Forty-Fifth Floor
Los Angeles, California 90071
Telephone: 213.542.8000
Facsimile: 213.542.8100

Attorneys for Defendants Stan Black & Decker (U.S.) Inc. and Platt Electric Supply, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR R. YOST, JR.; ERIKA YOST, | Case No. 3:12-cv-03969 JST |
| Plaintiffs, | [Assigned to Judge Jon S. Tigar] |
| vs. | Related Case:<br>Yost v. Rohm Co., Ltd. |
| DEWALT INDUSTRIAL TOOL CO.;<br>PLATT ELECTRICAL SUPPLY, INC.,<br>DOES 1 TO 100, | No. 4:13-cv-5203-YGR<br><br>**DECLARATION OF DAVID SITTER** |
| Defendants. | Date: March 20, 2014<br>Time: 2:00 PM<br>Ctrm: 9 |

I, David Sitter, declare as follows:

1.  I am an employee of Stanley Black & Decker, Inc.; prior to the merger of Black & Decker (U.S.) Inc. with a subsidiary of The Stanley Works, I worked for Black & Decker. I have a BS and MS degree in engineering and am a registered professional engineer in the State of Maryland. For the last 15 years, I have been a Safety Assurance Manager, responsible for cordless power drills including the Model DCD 970 involved in this case. The model DCD 950 is the same product as the DCD 970, using a different battery chemistry in its detachable battery pack. For purposes of this litigation, the models 950 and 970 are the same product.

LAW OFFICES
HAIGHT, BROWN & BONESTEEL, L.L.P.
Los Angeles

SW05-0000349
10012924.1

1

DECLARATION OF DAVID SITTER

2. As Safety Assurance Manager I am in charge of safety reviews during product development for new product designs and redesigns of existing products. I also investigate claims, suits, and reports of injuries received from all sources, including correspondence, emails, calls to our 800 number, and served legal papers. Black & Decker is organized so that reports of injuries, or even safety concerns about a product not tied to an injury, are directed to the safety assurance manager responsible for that product line for evaluation and investigation. For cordless professional drills, over the last 15 years, that would be me. Reported occurrences and investigations are entered into a data base that I have searched in connection with the DCD 950/970 drills and the predecessor DC 925/927 drills.

3. The model DCD 950/970 drills sold in excess of 1,100,000 units, which is considered a high sales volume in this industry. The only reported personal injury relating to the chuck on a model 950/970 drill is the present *Yost* matter. For the over 1,100,000 units sold, there are only two reported personal injuries, neither involving an allegation of a defective chuck or a chuck malfunction. Other than Mr. Yost's allegations, there are no other chuck related claimed injuries before or after the date of Mr. Yost's claimed incident, nor did anyone report to us a safety concern about the chuck on those drills, other than the allegations in the *Yost* case. I have reviewed Mr. Yost's complaint and his deposition and am familiar with the allegations in this case.

4. The predecessor models to the DCD 950/970 hammerdrills were the DC 925/927 hammerdrills. Those predecessor drills used an earlier version of a chuck that was redesigned and ultimately used on the DCD 970 model which is the subject of this case. Any claims arising from the DC 925/927 drills would also have been referred to and investigated by me. We have had no chuck-related injury claims on either of those models, using the earlier model of chuck.

5. During the 15 years I have been the Safety Assurance Manager for cordless drills, I have participated in the design review of approximately 100 different drill products. Reports of injuries, claims, or customer concerns about those products would,

LAW OFFICES
HAIGHT, BROWN &
BONESTEEL, L.L.P.
Los Angeles

SW05-0000349
10012924.1

2

DECLARATION OF DAVID SITTER

per our organizational structure, have been directed to me for investigation, evaluation, and possible response. With respect to all those products, which have used a variety of chuck designs from various chuck manufacturers, I have never learned of any incident involving a personal injury claimed to result from a drill chuck slipping or disengaging from a drill bit.

6. During the safety review process for the DCD 950/970 drills (pre-release) Black & Decker considered a long list of potential hazards that could result from the use and charging of these cordless drills. That list did NOT include the potential of someone falling off a ladder or being injured in any way as a result of a fall related to a bit becoming loose or being released by a drill chuck. Certainly a chuck that fails to hold bits securely would be an inconvenience to the user and a possible cause for a warranty claim for chuck replacement or a tool return to a retailer. It was never considered, however, to present a hazard to the user.

7. The DCD 950/970 drills of the sub-type involved in this case ("Type 1") had an expensive, largely handmade, German, keyless chuck that was purchased by Black and Decker as a component part from Rohm, GmbH. Black & Decker does not manufacture chucks itself, instead purchasing them in all cases from outside suppliers who specialize in designing and manufacturing chucks. At the time Mr. Yost's drill was designed and sold, Rohm was considered by Black & Decker to be the premier worldwide supplier of chucks for portable power tools such as the hammerdrill involved in this case. In head to head testing over the years, Rohm chucks consistently outperformed chucks from other manufacturers. At the time the plaintiff's drill was manufactured and sold, Black & Decker was not aware of any source for a more reliable keyless chuck than the one that was used on Mr. Yost's drill.

8. The keyless style of chuck as used on the DC 925, DC 927, DCD 950 and DCD 970 models of drill can be tightened on an accessory such as a drill bit by hand. This type of chuck is essentially a universal feature for drills of this type, as produced by Black & Decker and its competitors. A keyless chuck saves the user the time and the

LAW OFFICES
HAIGHT, BROWN &
BONESTEEL, L.L.P.
Los Angeles

SW05-0000349
10012924.1

3

DECLARATION OF DAVID SITTER

inconvenience of using a separate tool (the "key") to tighten the jaws of the chuck on an accessory. The user also avoids the inconvenience of having to keep track of the key when not in use. Without a key, a key style chuck is essentially unusable. Keyless chucks are more complicated mechanically than keyed chucks, and more expensive for manufacturers to purchase and install on drills. Accessories can and do sometimes come loose in keyed chucks.

9.  The Rohm chuck on Mr. Yost's drill is referred to as the -90 model Rohm chuck. The "-90" moniker is shorthand for its model number. The -90 is a redesign (by Rohm, working with Black & Decker) of an earlier Rohm model chuck referred to as the -75. The -75 chuck was used on the predecessor hammerdrills, models DC 925 and DC 927. There were concerns about the reliability of some units of the -75 chucks as used on the predecessor hammerdrills. Again, these concerns were never about safety, and I am unaware of any injury related to an alleged malfunction of a -75 predecessor model chuck on any model of Black & Decker drill.

10.  The premium Rohm chuck as used on Black & Decker drills is sufficiently expensive as a component of a hammerdrill, and sufficiently time consuming to change out, as to make any unit requiring a warranty replacement under the Black & Decker's three year warranty unprofitable to the company.

11.  As to the specifics of the improvements that were made which resulted in the -90 chuck, I defer to Aris Cleanthous who was the primary person at Black & Decker involved in working with Rohm on improvements to the -75 chuck and what became the -90 model chuck. I have, however, computed the relative improvement in reliability that Mr. Cleanthous and Rohm achieved in making their design improvements to the -75 model chuck to make it the -90 chuck of the type installed on Mr. Yost's drill. Using Black & Decker's business records of replacement parts installed by service centers (records which have been produced to plaintiff in this case) and including all failure modes that might cause a customer to need a chuck replacement, including the chuck becoming stuck open, undesired opening in forward mode, undesired opening in reverse mode (as claimed in this

LAW OFFICES
HAIGHT, BROWN &
BONESTEEL, L.L.P.
Los Angeles

SW05-0000349
10012924.1

4

DECLARATION OF DAVID SITTER

case), the chuck coming off the spindle, impact damage to the chuck, chuck cannot be opened to remove accessory and excessive run-out, I have determined that the redesign of the previous model -75 chuck to the -90 specifications resulted in parts replacement of chucks on the -90 model chuck dropping to just about one tenth the number of replacements made on the -75 chucks. To put it another way, reliability of the chucks was increased approximately tenfold by the design improvements made to the prior model chuck. The replacement rate for the -90 chuck involved in this case was *less than* 0.569%. Since this number includes replacements for all reasons as above; the replacement rate involving the failure mode at issue in this case (releasing a bit on reverse) would actually be much smaller than 0.569%. The replacement data I have used for this calculation necessarily includes replacements of chucks on the DCD 950/970 drills that had an entirely different Rohm chuck that later became available to us and replaced the -90 chuck to cut production costs. Drills with this later model chuck are referred to as "Type 2" models. Again, inclusion of replacements on Type 2 model drills is another reason that the replacement rate of 0.569% is significantly higher than replacements due to the condition at issue in this case.

12.   I have reviewed business records prepared during the development of the DCD 950/970 hammerdrill. Those records document the successful field testing of units that used the new -90 chuck. This testing occurred prior to the release of the product for large scale production.

13.   It has been suggested in this case by plaintiff that the Model DCD 950/970 hammerdrills were 'rushed to market' for some reason. Given the importance of this product to Black & Decker, the company wanted this product to be, if I may use a baseball metaphor, a home run. The idea of releasing the product prematurely was never

//
//
//
//

LAW OFFICES
HAIGHT, BROWN & BONESTEEL, L.L.P.
Los Angeles

SW05-0000349
10012924 1

5

DECLARATION OF DAVID SITTER

considered and, in fact, the drills were released several months late. Introduction was held up for issues having nothing to do with the -90 chucks used on the drills.

Executed on February 7, 2014, at Towson, MD.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*David Sitter*
David Sitter

LAW OFFICES
HAIGHT, BROWN &
BONESTEEL, L.L.P.
Los Angeles

SW05-0000349
10012924.1

6

DECLARATION OF DAVID SITTER